## TERKELSEN MACH. CO. v. PIERCE WRAPPING MACH. CO.

(Circuit Court of Appeals, First Circuit. May 5, 1925.)

No. 1800.

1. Patents ⬳48—Claims for wrapping for annular object held invalid.

Claims for wrapping consisting of continuous strip of paper wound spirally about an annular object and strip of tape adhesively applied to folds of first strip to hold them in fixed relation, held invalid as claiming distinct article, a wrapping, which could not be manufactured or exist apart from object wrapped.

2. Patents ⬳46—Useless articles are not subject of patent.

Useless articles are not subject of patent.

3. Patents ⬳328—No. 1,153,704, for wrapping for annular objects, invalid.

Pierce patent, No. 1,153,704, September 14, 1915, claims 1 and 2, for wrapping for annular objects, held not to involve invention.

4. Patents ⬳328—No. 1,158,278, for machine for wrapping annular objects spirally and applying adhesive tape transversely, held not infringed.

Pierce patent, No. 1,158,278, claims 17, 20–22, for machine for wrapping annular objects spirally and for applying an adhesive tape transversely of spiral folds having revolving shuttle carrying roll of paper, held not infringed.

5. Patents ⬳328—Machine for wrapping annular object spirally and applying adhesive tape transversely held not to involve invention.

Machine for wrapping annular object spirally and for applying adhesive tape transversely

of spiral folds, covered by Pierce patent No. 1,158,278, claims 17, 20–22, held not to involve invention.

**6. Patents ⟨⟩328—No 1,238,318, for device for pressing together sides of tire casing while being spirally wrapped, held not infringed.**

Midgley patent, No. 1,238,318, claim 6, for device for closing beads, or pressing together two edges of tire casing during process of spiral wrapping, held not entitled to broad construction, in view of prior art, and not infringed.

**7. Patents ⟨⟩328—Wrapping device for annular objects, with automatically adjustable supporting and alining members, held not to involve invention.**

Wrapping machine for annular objects, having means for holding and rotating article and shuttle mechanism for applying spiral wrapping with differential adjustment to maintain advanced relation between shuttle and article, and having automatically adjustable alining member, covered by Pierce patent, No. 1,263,-923, claims 1, 3, 15, 16, held to involve only mechanical skill.

**8. Patents ⟨⟩328—No. 1,263,923, consisting of wrapping machine for annular objects with automatically adjustable alining and supporting device, not infringed.**

Pierce patent, No. 1,263,923, for wrapping machine for annular objects having means for holding and rotating object and shuttle mechanism for spiral wrapping with automatically adjustable alining and supporting members, if involving invention, held not infringed.

**9. Patents ⟨⟩328—Device for unitary control of tire wrapping machine held not to involve invention.**

Device for connecting up control mechanism of tire wrapping machine resulting in unitary control, covered by Pierce patent, No. 1,432,034, claim 1, held not to involve invention.

**10. Patents ⟨⟩328—No. 1,432,034, for device for unitary control of tire wrapping machine, not infringed.**

Pierce patent, No. 1,432,034, claim 1, for device for unitary control of tire wrapping machine, if valid, held not infringed.

Appeal from the District Court of the United States for the District of Massachusetts; Clarence Hale, Judge.

Suit by the Pierce Wrapping Machine Company against the Terkelsen Machine Company. Decree for plaintiff (300 F. 147), and defendant appeals. Reversed and remanded, with directions to dismiss.

George P. Dike and Henry R. Ashton, both of Boston, Mass. (MacLeod, Calver, Copeland & Dike, of Boston, Mass., on the brief), for appellant.

Albert L. Ely, of Akron, Ohio, and Harrison F. Lyman, of Boston, Mass. (Fish, Richardson & Neave, of New York City, on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This is a suit in equity brought in the federal District Court for Massachusetts by the Pierce Wrapping Machine Company, an Illinois corporation, against the Terkelsen Machine Company, a Massachusetts corporation, for infringement of letters patent No. 1,153,704, applied for March 27, 1913, issued September 14, 1915, to Frank M. Pierce for a wrapping, and now owned by the plaintiff; for infringement of letters patent No. 1,158,278, applied for August 7, 1911, issued October 26, 1915, to plaintiff as assignee of William B. and Frank M. Pierce, for a machine for wrapping annular objects such as coils of wire, etc.; for infringement of letters patent No. 1,238,318, applied for July 17, 1913, issued August 28, 1917, to Morgan & Wright, assignee of Thomas Midgley, and now owned by the plaintiff; for infringement of letters patent No. 1,263,923, applied for October 3, 1914, issued April 23, 1918, to the plaintiff as assignee of Frank M. Pierce, for a wrapping machine; and for infringement of letters patent No. 1,432,034, applied for September 15, 1920, issued October 17, 1922, to Paul Pierce and now owned by the plaintiff.

The claims in issue under patent No. 1,-153,704 are Nos. 1 and 2:

"1. A wrapping, comprising a continuous strip wound spirally and transversely upon an article of ring form, and a wrapping strip applied adhesively to the folds of said spiral strip to hold the same in fixed relation.

"2. A wrapping comprising a continuous strip wound spirally and transversely in overlapped relation upon an article of ring form, and an adhesive wrapping strip applied to the folds of said spiral strip peripherally of the article wrapped."

The claims in issue in letters patent No. 1,158,278 are Nos. 17, 20, 21, and 22:

"17. In a machine for wrapping annular objects, feed rolls for supporting and rotating said objects, an annular shuttle rotatable through the eye thereof and having wrapping material loosely contained therein, folding, guiding and tensioning mechanism acting to fold and direct the wrapping material spirally around the article wrapped, and means operated in part by the rotation of the object wrapped for applying an adhesive tape transversely of the wrapping as the wrapping progresses."

"20. In a tire wrapping machine, a shuttle adapted to apply a spiral wrapping on a

tire, means for applying another wrapping on the outer periphery of the spirally wrapped tire, parallel to the axis of said first wrapping, and mechanism forming a part of said machine for holding said tire in upright position and adjustable for tires of different size.

"21. In a wrapping machine for applying a helical wrapper to an annular shaped article, means for applying another wrapper on the outer periphery of the article on said first wrapper, and mechanism adjustable for articles of different size for supporting an article in upright position independently of the wrapping means.

"22. In a machine of the class described, means for applying transverse and longitudinal wrapping strips simultaneously one upon the other upon an annular body, and mechanism adjustable for bodies of different size to support the same in upright position for wrapping."

The only claim in issue under letters patent No. 1,238,318 is No. 6:

"In a machine for wrapping annular tire casings and the like, the combination of an incomplete annular housing, an annular shuttle having an opening for the passage of a tire casing therethrough, means for rotatably supporting the shuttle within the housing, means for supporting within said shuttle the tire casing to be wrapped, means for turning said shuttle and tire casing at predetermined relative rates, a roll of wrapping material rotatably mounted on the shuttle, and means for pressing together the two edges of the tire casing adjacent to the point at which the wrapping material is being applied thereto."

The claims in issue under letters patent No. 1,263,923 are Nos. 1, 3, 15, and 16:

"1. In a wrapping machine of the class described, connected mechanism simultaneously and differentially adjustable for holding and rotating an annular article, and a paper carrying shuttle adapted to rotate through the eye of the article to apply a spiral wrapping thereon, said shuttle positioned forwardly of the center of the tire."

"3. In a wrapping machine of the class described for annular articles, means supporting and rotating the article, mechanism for applying a spiral wrapping thereon, said mechanism comprising a power driven sectional shuttle positioned to rotate through the eye of the article in advance of the center thereof, and said means simultaneously and differentially adjustable to maintain the advance relation between the shuttle and article in all adjustments of said means."

"15. In a tire wrapping machine of the class described operatively connected differentially adjustable supporting means for the tire, a shuttle disposed to rotate through the eye of said tire, said means in all adjustments positioning said tire to permit rotation therethrough of said shuttle in advance of the center of the tire, and swingingly mounted gravity action guiding mechanisms engaging the upper periphery of the tire to maintain the same properly positioned upon said differentially adjustable means.

"16. A wrapping machine comprising a plurality of simultaneously and differentially adjustable supporting members, an alining member automatically adjustable to and from the supporting members by the insertion of the article to be wrapped, and mechanism for wrapping the article."

Only claim 1 is in issue under letters patent No. 1,432,034:

"1. In a tire wrapping machine, means for rotatably supporting a tire to be wrapped, a wrapping material carrier rotatable through the eye of the tire, means for pressing the beads of the tire to be wrapped, mechanisms for stopping the rotation of the tire and of the wrapping material carrier, and a single lever for controlling said stopping mechanisms and pressing means."

The defenses are anticipation, noninvention, and noninfringement. In the District Court all the claims were held valid and infringed, and this appeal was taken.

[1, 2] The first patent, the one for a wrapping, involves a continuous strip of paper spirally wound about an annular object and a strip of tape adhesively applied to the folds of the first strip to hold them in fixed relation. The two claims in issue under this patent are substantially the same, the only difference being that in claim 2 the adhesive strip is applied peripherally about the article wrapped, while claim 1 is not thus limited as to the place where the strip is to be applied. It will be noted that neither of these claims include the article of ring form about which the continuous strip is wound spirally and transversely as an element of the combination; that the combination composing the alleged wrapping is limited to the strip wound spirally and transversely and the strip applied adhesively thereto. It is evident that the wrapping cannot be made except on an annular structure or exist as a wrapping apart from the structure on which it is made. When made on an annular structure it becomes a part of it and can be removed only by being destroyed. It would seem, therefore, that as the alleged

wrapping cannot be made apart from an annular structure and is of no use as a wrapping when severed from it, it is not, in and of itself, the subject of a patent, for in and of itself it is useless. If it could be made apart from an annular structure, it would still be useless, for it could not be applied as such to an annular article like a tire or coil of wire. We think these claims are invalid as claiming a distinct article, a wrapping, inasmuch as it cannot be manufactured or exist apart from the annular article on which it is made and of which it becomes a part. Useless articles are not the subject of a patent.

[3] But apart from the foregoing consideration, we are of the opinion that neither of these claims involve invention. At the time this patent was applied for, it had long been old in the art to wind a strip of paper spirally and transversely about an article of ring form by hand and by machine. It was also old, extending back beyond the memory of man, to apply an adhesive strip of paper to other strips for the purpose of holding them together in fixed relation. And long prior to the application for this patent gum tape had been put upon the market commercially and made use of in various ways. It had been used as a binding around the folds of a box (Gair, No. 981,993), to secure together the adjacent edges of two pieces of card board (Bodine, No. 852,761), for sealing together the two halves of semispheres of a container for a ball of twine or yarn by placing the adhesive tape along the line of junction of the two semispheres (Patureau, No. 42,902, May 24, 1864; Haff, No. 237,267, February 1, 1881; Worcester, No. 302,461, July 22, 1894), and for holding together longitudinal strips of crumpled paper when used as a wrapping for bottles or other breakables, the longitudinal strips being held by several circular or peripheral strips (Mauran, No. 620,850).

The function and mode of operation of the gum strip as applied by Patureau, Haff, Worcester, and Mauran are identical with the function and mode of operation of the gum strip as applied by the plaintiff in its claims; and the patent to Shirley (No. 273,902, March 13, 1883) discloses the application of a peripheral strip of gum tape about a paper bag, the ends of which are rounded. It was plainly obvious, whether one was skilled in the art or was not, that the spiral folds of the old wrapping about an annular object could be held together and in fixed relation by pasting across them an adhesive strip of paper, and that if the adhesive strip extended around the annular article the more likely it would be that all the spiral folds would be held together and in fixed relation. Neither the spiral folds nor the adhesive strip required readaptation for the application of the latter to the former, so that even mechanical skill was not brought into play to effect the application, and nothing new in the way of means was employed.

In Andrews v. Thum, 67 F. 911, 15 C. C. A. 67, it appeared that, "in the preparation of medicinal plasters, it was common to spread upon a sheet of leather or paper a medicated composition, either slightly or not at all adhesive, and to surround it with a margin of more adhesive substance, intended to secure the plaster to the surface on which it was to be applied," and in considering a claim for "a sheet of fly paper partially covered with a sticky composition, the latter being surrounded with a band or margin of less, but still slightly, adhesive material," the court says:

"To apply this old method in the preparation of fly paper only called for the transposition of these materials. All the patentee did was to reverse the order, and put the less adhesive material on the outside or margin, and the more adhesive in the middle of the sheet. Such a rearrangement required no invention, but would suggest itself to any one skilled in the art. It is not sufficient that the patentee may have produced a better and more merchantable article, but there must have been something novel in the means which were employed in its production. What constitutes patentability, in this class of cases, is clearly expressed by the Supreme Court in the recent case of Knapp v. Morss, 150 U. S. 221, 14 Sup. Ct. 81."

In that case the old means required rearrangement to effect the desired result, but as rearrangement only called for mechanical skill, it was held not to involve invention, even though the patentee by rearrangement produced a better and more merchantable article. If the situation there presented did not involve invention, much less do we think it does here, where no rearrangement or readaptation was required. It is an old and well-known practice to unite strips of material by pressing adhesive strips across them to strengthen and hold them together. See, also, Linscott Supply Co. v. Hopewell, 212 F. 403, 129 C. C. A. 79, where was involved an annular tire case or cover made of any suitable material, preferably water repellant, and so made as to completely inclose a tire and capable of adjustment in such a way as to fit closely to the outer and inner

rims of the tire; and it was held devoid of invention as the particular means employed —the cover, the overlapping strips, and the pocketed edge for the cord—were old and their readaptation and application in the tire covering called only for mechanical skill and it did not involve invention.

[4] The second patent, No. 1,158,278, is for a machine for wrapping annular objects spirally and for applying an adhesive tape transversely of the spiral folds.

Machines for applying spiral wrappings automatically were devised as early as 1886; and machines for moistening gum tape and applying it to wrappings of a variety of shapes were also in use before the application for the patent in question. A spiral wrapping was first applied to such ring shaped articles as coils of wire and afterwards to tires for automobiles. The machines for applying the spiral wrapping, whether paper or cloth, about an annular object consist primarily of mechanism such as driving rolls for rotating slowly the tire or annular object, a shuttle which encircles the tire at one point and carries a roll of paper around the tire, winding it on as the tire rotates, and folding and tension mechanism for folding and tensioning the paper strip as it is wound on. The shuttle has an opening on one side to allow the tire or annular article to be inserted, the opening being closed with a gate. The shuttle and driving rolls are rotated by suitable mechanism in timed relation to each other, the shuttle rotating faster than the driving rolls, so that the paper will be wound progressively onto the tire as it rotates. As early as 1886 J. A. Dixson obtained letters patent No. 351,584 for a machine for wrapping coils of wire. It had a housing, a shuttle carrying a roll of paper, folding and tension mechanisms, driving rolls for rotating the coil of wire through the eye of the shuttle, and suitable mechanism for operating the coil and shuttle in timed relation to each other.

In May, 1902, G. F. & G. M. Wright obtained letters patent No. 700,713, for a machine for wrapping coils of wire. It had a rotatable shuttle carrying a roll of paper with tensioning mechanism, to wind the coil, driving rolls to rotate the coil, adjustable means for centering the coil of wire in the shuttle, and adjustable guide rolls to guide and hold the coil of wire centrally of the shuttle. The frame or yoke carrying the shuttle was so arranged that it could be adjusted to raise the shuttle or lower it as was required to center the coil in the shuttle.

And in January, 1907, one C. E. Miller obtained letters patent No. 840,642, for a machine originally intended for winding cloth about a partially completed tire to form an inclosure for it when being vulcanized. It shows a shuttle which carries a roll of cloth tape under tension and two pairs of feed rolls. It is also provided with mechanism for forcing the feed rolls together to compress the sides of the tire. Machines made under this patent were used not only to wrap cloth on completed tires to repair them, but also to wrap paper on completed tires for shipment. They were in public use prior to the plaintiff's invention and were known to the plaintiff's patentee, as was the Wright patent, which was apparently the basis of plaintiff's wire machine.

The plaintiff's patentees, in this wire machine, adopted the old elements, shown in Wright and prior patents, of a revolving shuttle carrying paper to be wound on a coil of wire, of driving rolls, of four adjustable guide rolls, positioned as in Wright, to hold the coil of wire in alinement with the center of the shuttle, and added as an element mechanism for carrying and moistening a roll of gum tape so that a strip of gum tape might be attached by the operator to the periphery of the coil of wire after the spiral wrapping had begun, so that the rotation of the coil of wire, as the wrapping progressed, would draw the tape across the spiral folds in the region of the periphery of the coil—the machine, aided by the operator, laying about two-thirds of the gum tape, the operator laying the other third. The plaintiff's shuttle is of a peculiar construction. It does not carry its paper upon a spool, as does the defendant's machine and most of the prior art machines, but the shuttle is hollow and the paper is folded back and forth on itself and placed in the hollow shuttle and then its leading end drawn out. This feature is what is meant by the expression in claim 17 of the patent—"having wrapping material loosely contained therein"—which differentiates it from the separate roll construction shown in defendant's machine. The four adjustable guide rolls are arranged two on the front of the machine, numbered 141 in Fig. 1, and two on the back of the machine, numbered 11 and 14 in Fig. 2. Each of the rolls is supported on a bracket and held by a yoke 140. The four rolls, two on each side of the machine, are adjustable sidewise through two slide rods 139. The slide rods are held in adjustment by the set screws 143 and the outer ends are connected by a cross rod. This arrange-

ment of the guide rolls is such that two are on each side of the coil near the point where it passes through the eye of the shuttle, and two on each side of the shuttle. Their purpose is to hold the coil of wire in alinement during its course through the eye of the shuttle while being wrapped; and to do this these guide rolls may be adjusted to the thickness or cross-section dimension of the coil through the slide rods 139. This adjustment is for a cross-section dimension of the coil and not for its circumferential diameter. The adjustable guide rolls constitute the mechanism "for holding said tire in upright position and adjustable for tires of different size," referred to in claim 20. They serve the same purpose and are of the same nature as the adjustable guide rolls 24 in the Wright patent. They simply come against the sides of the coil of wire to hold it in position. The defendant's machine has no adjustable guide rolls for supporting the coil of wire or tire to hold it in an upright position and to guide it through the shuttle. It has an adjustable top roll that is adjustable up and down to meet the outer circumference of a coil or tire, but it is not adjustable sidewise—its flanges are fixed.

The defendant's machine does not have an annular shuttle having wrapping material loosely contained therein. For this reason we do not think it infringes claim 17, and, as it does not have guide rolls adjustable to the cross-section of a coil or tire to hold it in upright position, the mechanism called for in claims 20, 21, and 22, we do not think it infringes those claims.

[5] Furthermore we are of the opinion that none of these claims involve invention. All the elements in them are old, including the mechanism for applying the gum tape. Piper, No. 700,815, May 27, 1902; Piper, No. 700,816, May 27, 1902; Colvin, No. 759,675, May 10, 1904; Browne, No. 900,352, October 6, 1908; Brownson, No. 913,614, February 23, 1909. They involve nothing more than so applying to an old wrapping machine the well-known gum tape mechanism that it may pay out the gum tape over the outer circumference of a tire or coil of wire, either by positioning the tape mechanism upon a bracket in some suitable place attached to the machine or moving up a table, on which it may be located, to a proper position for paying out the tape. If it called for mechanical skill, it was surely skill of a very low order. It did not involve invention.

[6] The Midgley patent, No. 1,238,318, applied for July 17, 1913, issued August 28, 1917, for a bead closer, comprises a hous-

ing or standard carrying a rotatable shuttle with a spool for tape, with two horizontal arms extending out from the housing, one on each side of the shuttle, each arm carrying within it a power driven shaft on which is mounted a sleeve rotatable with the shaft in the nature of a roll, at one end of which sleeve or roll is a fixed flange or bead, and at the other end is an adjustable flange or bead that can be moved horizontally in or out to press against the toes or beads of the inner circumference of a tire. The revolving sleeve or roll of each arm is so located that when the inner circumference of the tire is placed upon it, the tire is positioned in the center of the shuttle for wrapping, supported by each sleeve or roll, and held in position by the flanges or beads which press directly against the toes or beads of the tire and hold them together at the point where the paper wrapping is applied; the paper wrapping being applied to the tire between the sleeves or rolls on the two horizontally extending arms. The flanges or beads revolve with the sleeves or rolls of which they are a part. The special feature of this invention is that the paper wrapping is applied to the tires, when the beads are closed, thus reducing the size of the tire and enabling it to be wrapped more loosely or with less tension on the paper, which becomes a tight wrapping as soon as the portion of the wrapped tire has passed beyond the sphere of the flanges or beads, when, the toes or beads of the tire being released, the tire expands resuming its original shape and tightening the wrapping.

The claim is that this method of wrapping is better, in that it reduces the liability of the paper to break and results in a closer wrapping. The plaintiff's contention is that Midgley was the first to invent a machine for this method of wrapping; that the idea of closing the beads was new with him; and that the claim should not be limited to flanges or beads pressing directly against the toes or beads of a tire to compress them, but should be given a broad construction and cover means for pressing against the sides of a tire which may compress the beads, although, in so doing, they may distort the sides of the tire.

The defendant, in its machine, and the plaintiff, in its commercial machine, employ four nonpower driven rolls, two of which are positioned on one side of the shuttle and two on the other, between which the paper strip is wound upon the tire, and two of the rolls are on one side of the tire and two on the other. They are all adjustable with ref-

erence to the sides of the tire and when thrown in toward it press against its sides and close the toes or beads. The means employed by the plaintiff and by the defendant in these machines do not differ in any essential from the guide rolls employed by the plaintiff in its wire wrapping machine in its patent No. 1,158,278, or by the Wrights in their patent No. 700,713, except that the guide rolls in the two latter machines will not function properly to close the beads, for if the guide rolls in the plaintiff's wire wrapping machine, and probably in the Wright machine, are pressed sufficiently hard against the sides of a tire to close the beads, the tire will be thrown up off the driving rolls and will not revolve. This is due to the fact that the driving rolls in the plaintiff's wire wrapping machine and in the Wright machine, which rotate the tire, are located in the lower part of the machine and at a distance from the point at which the tire passes through the eye of the shuttle where the wrapping takes place; whereas, in the Midgley machine and other machines of that general type, such as the Miller, the driving rolls, which support and rotate the tire, are located in the upper part of the machine near the shuttle where the wrapping takes place.

The evidence shows that the machine of the Miller patent was originally designed and intended to wrap strips of cloth spirally about an incomplete tire in the process of manufacture to serve as a cover or mold while being vulcanized, and that when so used the incomplete tire contained a metallic core extending down to its inner circumference to form the toes or beads, and that, under such circumferences, it was impossible for the four rolls (two sets each through which the tire is fed in the process of wrapping and which support, rotate and compress the tire) to operate to close the beads for they were held apart by the core. But there was evidence that the Miller machine was also used and was capable of use in winding strips of cloth on paper about a completed tire after the metallic mold had been removed. It was used to repair old tires without a metallic core, but having within them a cloth bag filled with oats or an inflated rubber tube under moderate pressure, neither of which extended down between the formed toes or beads of the tire. In this way completed tires were wrapped by the Miller machine with cloth so that the parts being repaired might be vulcanized. In doing this the rolls through which the tire was fed compressed the beads by pressure against the sides of the tire. The evidence also shows that the Miller machine was used for wrapping completed tires with paper to be shipped out to the trade, and that, when so wrapped, the rolls through which the tire was fed compressed the beads by pressing against the sides of the tire, the rolls being positioned on each side of the shuttle and each side of the tire, and produced a satisfactory wrapping.

The plaintiff contends that this was not a commercial paper wrapping machine, and it would also have us understand that it was not used prior to the Midgley application for this purpose. The contention as to its not being a commercial paper wrapping machine is based on the fact that it takes it some minute and a half or two minutes to wrap an automobile tire, whereas the modern machine will wrap from three to four such tires in a minute. But it appears that the Midgley machine also was a very slow machine compared with the modern machines. The plaintiff further says that the Miller machine was not a practical paper tire wrapping machine, in that the rolls are so positioned that they do not adequately support the tire during the process of wrapping and require the operator to assist in supporting it while it is being fed through the machine by taking hold of the tire so that the portion of it toward him will not drop down and put the tire out of alinement with the rolls which compress the sides of the tire and support and rotate it. But the evidence coming from the plaintiff's own expert shows that with the workman assisting in supporting the tire the Miller machine will put on a good wrap, will close the beads satisfactorily, and that the paper will tighten up after passing the point of wrapping, exactly the same as in the Midgley machine. The expert further testified that in 1907, when the Miller patent was granted, and prior thereto, he did not recall any paper spiral wrapping of tires and that the Miller machine was a most excellent machine compared to the state of the art at that time; that it was far superior to hand wrapping; that, while it would take about two minutes to wrap a tire with the Miller machine, it would take considerably more time to wrap a tire by hand.

In the patent of the Miller machine only one of the four rolls through which the tire is fed is spoken of as power driven. There was evidence, however, that Miller at an early day arranged a cross-chain so that two of the rolls were power driven and evidence was submitted by the plaintiff describing how the machine operated with one power

driven roll assisted by the workman, and also how it operated when provided with two power driven rolls assisted by the workman, and that it worked very differently in each case. It also appeared that Mr. Midgley, the inventor of the Midgley machine, and a witness for the plaintiff, before conceiving his device and in preparation therefor, had before him and operated the Miller machine wrapping tires with a paper wrapping. This was in 1911. He describes how the machine at that time operated when assisted by the operator and his description of the operation of the machine at that time, when so assisted, shows that it worked just the same as described by the other witnesses for the plaintiff when the machine was provided with a cross-chain for operating two rolls under power and assisted by the operator. This we think is corroboration of an indubitable character to support the testimony of Mr. Miller that at an early day and prior to the application for the Midgley patent, and even before Midgley's conception of providing means for direct pressure against the toes or beads of the tire was thought of, the cross-chain for operating two rolls under power was in use for wrapping tires with paper. Mr. Midgley himself testified that his machine, as he first constructed it, had no bead compressor or means for compressing the beads of the tire. He further testified that what he undertook to do in the construction of his bead closers was to apply the force to the beads or toes of the tire; that it was better on that account than the Miller machine, which applied the force on the sides of the tire; that the advantage of his machine over Miller's was that it applied the force to the toe of the tire without distorting the tire.

In view of the state of the art existing at the time Midgley applied for his patent, we do not think that the language of claim 6, where it says, "and means for pressing together the two edges of the tire casing adjacent to the point at which the wrapping material is to be applied thereto," should be given a broad construction and include means pressing against the sides of the tire to compress the two edges or beads, and that so construed the defendant's machine does not infringe this claim.

[7] In the Pierce patent, No. 1,263,923, known as the differential adjustment patent, the first two claims in issue (claims 1 and 3) are for a wrapping machine for annular articles having means (power rolls) for holding and rotating the article; mechanism (a paper carrying shuttle) for apply- ing a spiral wrapping thereon positioned forwardly of the center of the annular article or in advance of the center thereof, said means (power rolls) being simultaneously and differentially adjustable to maintain the advanced relation between the shuttle and the article. Claim 1 is more restricted in its language than claim 3, in that it states that the mechanisms or means (the power rolls on the swinging arms) for supporting and rotating the article are connected. The fifteenth and sixteenth claims are like the first and third, respectively, except that they include as an additional element an automatically adjustable alining member or swingingly mounted roll designed to engage the periphery of the tire during the wrapping operation, which is located at the top of a standard on the machine. In this device the power or driving rolls and shuttle are positioned in close proximity in the lower part of the machine. There are two power rolls for supporting and rotating the tire, one on each side of the shuttle, supported on swingingly mounted arms, and the arms are connected by a cross-link so positioned and connected to the arms supporting the respective power rolls that, as they are swung outwardly and downwardly or inwardly and upwardly, the roll on the left arm moves faster and to a greater distance than the roll on the right arm. When the arms carrying the power rolls are in their highest position, they are then adjusted to wrap the smallest tire of which the machine is capable. The tire is then centered in the shuttle, and the shuttle is positioned forwardly of the center of the tire. To then adjust a larger tire in the machine so that it will be centered in the shuttle and the shuttle positioned forwardly of the center of the tire, which is the desired wrapping position contemplated by this machine, the two rolls are lowered to center the tire in the eye of the shuttle, and the left roll is lowered to a slightly greater extent than the right roll for the purpose of advancing the shuttle forwardly of the center of the tire, and the link connecting the two arms supporting the rolls is so positioned that the rolls may be lowered simultaneously and differentially with reference to each other to accomplish the purpose. The automatically adjustable mounted member or swinging arm at the top of the standard, referred to in claims 15 and 16, is so positioned that it may be swung up or down and is designed to contact with the outer circumference of the tire to hold it in upright position in the eye of the shuttle when placed in the machine for wrapping.

The primary questions under this patent are whether the claims are valid and entitled to a broad construction òr whether, in view of the prior art, they are limited to the structure shown with the connecting cross-link for accomplishing simultaneously the differential adjustment of the driving rolls. In other words, whether there is anything new shown in this patent other than the cross-link connection whereby the differential adjustment of the power rolls as respects each other is effected at the same time.

.The defendant's contention is that the Stevens patent, No. 1,196,044, applied for August 19, 1912, issued August 29, 1916 (a prior art patent), discloses means for centering the tire in the shuttle and positioning the shuttle forward of the center of the tire, the same as the plaintiff's patent; that the Stevens machine is one for wrapping spirally a tire with a strip of paper, the shuttle and power rolls of which are located in the lower region of the machine; that Stevens has two power driven rolls, one on each side of the shuttle, each roll being supported by a swinging arm, which arms can be swung outwardly and downwardly to center the tire in the shuttle and differentially to position the shuttle forward of the center of the tire; and that the only difference between the plaintiff's machine and that of Stevens as to obtaining the differential adjustment is that in the latter machine the adjustments are obtained by turning the two screw shafts 26 carrying the nuts 25, which cause the raising and lowering of the power driven rolls independently of each other.

. We agree with counsel for the defendant that the Stevens device discloses means for differential adjustment of the power rolls with reference to each other; that the chief difference between Stevens and the plaintiff's device is that Stevens has an independent differential adjustment of the rolls with reference to each other, while the plaintiff gets a simultaneous interdependent differential adjustment. The rolls in the plaintiff's device move differentially with reference to each other and, being connected by the cross-link so that they are interdependent, their movements are simultaneous. The rolls in Stevens being independent of each other, the time of the movement of each depends upon the operator as also does the extent of their respective movements to effect the differential adjustment. The plaintiff says that the Stevens patent does not disclose the idea of a differential adjustment. It undoubtedly discloses means for differential adjustment, and Fig. 2 of the patent shows the rolls in

differential adjustment, the left-hand roll being shown lower to a slight extent than the right-hand roll; and Stevens in his specification says that one object of his invention is to afford an exceedingly simple device "having a large range of adjustment, to adapt the machine for wrapping annular bodies of different sizes"; also "to provide means for positively supporting and for rotating the body to be wrapped, and for adjusting said supporting and rotating means relatively to each other"; and again:

"Means are provided for adjusting said feed or advancing rolls relatively to each other. For this purpose, as shown, a downwardly directed arm 24, is provided on each of said sleeves 14, and carried on the lower end of each is a nut 25, through which extends a screw shaft 26, pivotally mounted in a suitable bearing 27, therefor, secured upon the table 1, rotation of one of said screw shafts acting on the nut 25, to swing the corresponding advancing or feed roll outwardly or inwardly, dependent upon the direction of rotation, thus enabling either or both of said advancing and feed rolls to be adjusted to the most efficient position for supporting and rotating or advancing the object to be wrapped."

· And in his claims he speaks of "independently adjustable swingingly mounted rotatable means for supporting an annular shaped article in position to be wrapped, * * * said means movable radially of the article for adjustment of the article"; and again: "Swingingly mounted mechanisms to support an annular shaped article in position to be wrapped, adjustable radially of said article to shift the same;" and again: "Screw shafts, one on each side of the machine and engaging the respective yokes and acting to swing their grooved pulleys inwardly or outwardly to vary the adjustments of the machine as to the size of the article to be wrapped;" and again: "Means supporting and rotating an article to be wrapped * * * said means swingingly adjustable in a vertical plane to raise and lower said article to a proper wrapping position."

These claims, as well as the specification and Fig. 2 of the machine, all tend to show that Stevens had conceived the idea of a differential adjustment of each roll with reference to the other and that the only advance which the plaintiff made was by introducing the cross-link and so positioning it on the swinging arms that the adjustment of the rolls would be differential and, the rolls being connected through the cross-link and thus

made interdependent, the adjustment of them was accomplished simultaneously.

The close identity of means employed by the plaintiff's patentee in his letters patent No. 1,263,923 with those of the Stevens machine, is not surprising, for the evidence shows that he had the Stevens device before him at the time he began his work and that the Stevens device, which was compact and adjustable to tires of different sizes, furnished the foundation for it. It is thus apparent that the idea of a differential adjustment of the feed rolls in a machine for wrapping tires of different sizes and the means for accomplishing it were old, and that all the plaintiff's patentee did was to connect the swinging arms of the rolls by a link so positioned on the two arms as to make their movements interdependent and differential and consequently simultaneous. If this can be said to be anything more than the work of a skilled mechanic and to involve invention, it clearly is nothing more than a detailed improvement of the device of Stevens which would not entitle the plaintiff to broad claims.

We think, however, that with the Stevens machine before a skilled mechanic it would be obvious to him that if the two swinging arms were connected by a link, the movement of those arms would become interdependent and simultaneous the same as the movement of the wheels on a dump cart are when connected by a reach which permits the forward and rear wheels to be separated or brought closer together; and that the positioning of the connecting link on the respective arms to determine the difference in their movement and of the rolls they bear was a simple problem which any mechanic skilled in the art would readily understand and apply.

[8] But if the claims can be sustained as involving invention in so far as they relate to bringing about the old differential adjustment of the rolls by a simultaneous movement of the swinging arms and the rolls, we do not think that the defendant's machine infringes. The arms carrying the supporting rolls in the defendant's machine do not swing; they have no forward and backward movement. The left arm has no movement forward or backward or up or down. It is stationary. The shuttle is not stationary as in the plaintiff's patent or as in Stevens' patent, but may be moved up or down, as in Wright. Its movement up or down is for the purpose of centering the tire in the shuttle. If it is the equivalent of moving the rolls up or down for the purpose of positioning the tire in the shuttle, it is old. It was old with Wright to raise or lower the shuttle to position the tire in the center of the shuttle. It was also old with Stevens to lower the rolls to accomplish the same thing. When the right arm and roll are raised in the defendant's machine, the shuttle is raised at the same time but to a greater distance than are the right arm and roll. But the difference in movement of the right arm and roll is with reference to the movement of the shuttle, and not with reference to any movement of the left arm and roll, for they do not move at all. The instrumentalities in the defendant's machine effecting the simultaneous differential adjustment as between the shuttle and the right arm are shown in Plaintiff's Exhibit I 3. In that drawing S represents the yoke that carries the shuttle; G a verticle rod connecting the yoke with the end of a lever L located below the base of the frame of the machine. The lever L is pivoted at the point O at the right side of the base of the machine. At the point P on the lever L, which is nearer the point O, where the lever is pivoted, than the point at which the vertical rod G connects with the lever, the lever is connected to a lower extension of the sliding or right-hand arm F, which is mounted to slide up or down on a guide rod R, so that, when the yoke carrying the shuttle is moved up by the operator, arm F, which carries the power roll D, moves up to a less extent than the shuttle on the yoke S moves up, depending upon the difference between the points where the arm F and the rod G are connected to the lever L, and the same is true when the yoke S and arm F are moved down, so that the parts moved are the shuttle and its yoke S and the right arm F supporting the power roll D. Their movement is up and down and the movement between these two elements up or down is differential. The left roll C and its supporting arm remain stationary. The defendant's machine differs from that of the plaintiff both as to the means employed and the mode of operation.

[9] In plaintiff's patent 1,432,034, applied for September 15, 1920, and issued October 17, 1922, referred to as the unitary control patent, claim 1 is in issue and is for a tire wrapping machine embodying means for rotatably supporting the tire to be wrapped, a wrapping material carrier rotatable through the eye of the tire, means for pressing the beads of the tire to be wrapped, mechanisms for stopping the rotation of the tire and of the wrapping material carrier (all of which were old), and "a single lever

for controlling said stopping mechanisms and pressing means." In other words, the special feature here claimed is a single lever for controlling the mechanisms (the brakes) to stop the means (the rolls) that rotate the tire and for controlling the operation of the pressing means.

The machine shows four idle rolls, one pair of which is located on one side of the shuttle through which the tire passes to be wrapped, and the other pair is on the opposite side of the shuttle, and one of the rolls of each pair is located on one side of the tire and one of each on the opposite side; they press against the sides of the tire when being wrapped to close the beads of the tire. It also shows a power driven disk contacting frictionally with the shuttle and a clutch for connecting up the driving shaft on which the power driven disk is located. A brake adjusted to fit and to press against the circumference of the shuttle to stop its rotation after wrapping a tire, and also another brake adjusted to fit and to press against the circumference of the power driven disk that moves the shuttle, are shown. The patent also shows a shaft near the bottom of the frame and extending from the front to the rear of the machine and pivoted in bearings at its front and rear ends, having at its front end a crank arm 120 connected with a lever 40 pivoted at 40a. Positioned on the shaft are cams or crank arms, one set of which are connected with rods or levers extending upwardly to the four rolls that press the sides of the tire, and also on the same shaft are positioned cams or crank arms connected by rods extending upwardly to operate each of the brakes and the clutch. A movement by the operator of lever 40 in one direction revolves the shaft and sets in operation the respective cams or crank arms on the shaft, releasing the clutch, opening the bead rollers, and applying the two brakes, while a movement of the lever in the opposite direction releases the brakes, applies the clutch, and closes the bead rolls to press the sides of the tire.

In the prior art relating to this matter, we find plaintiff's patent for a wrapping machine, No. 1,158,278, provided with lever 116, possessing an unitary control. By movement one way of lever 116 the clutch is released shutting off the power, a brake is applied to a guide disk which frictionally engages the shuttle, and also, at the same time, opens the gate to the shuttle, and by a movement in the other direction releases the brake, closes the gate to the shuttle, and applies the clutch. Also plaintiff's patent

No. 1,263,923 shows a lever 110, which by a single movement in one direction opens the clutch, throws a brake upon the power driven disk that rotates the shuttle, and by a movement in the opposite direction throws off the brake and connects the clutch. And the question is: Is the idea of connecting up the rolls that close the beads of the tire with a single lever, so that it will control the opening and closing of the rolls as well as the opening and closing of the brake or brakes and of the clutch, invention in view of the prior art? We think not. The plaintiff's patent 1,158,278 shows how a brake, a gate to a shuttle, and a clutch can be controlled in starting and stopping a wrapping machine by a single lever, and the subjection of the bead closers to the control of the lever in the place of the gate was merely mechanical. It was old (Midgley) to connect a lever with the flanges or rolls that close the beads of a tire. The idea of connecting up such mechanisms in a way to be controlled by a single lever is clearly old and a broad claim, like the one in question, is plainly invalid, for the general problem is one well within the knowledge of a mechanic skilled in the art.

[10] Furthermore, if the plaintiff's control device could be regarded as involving invention, we think the claim should be limited to the specific means employed and that the defendant does not infringe. The claim calls for mechanisms—plural—for stopping the rotation of the tire and of the wrapping material carrier, and the patent shows a brake applied to the shuttle and another brake applied to the power driven disk on the main shaft which operates the driving rolls that advance the tire; and, by applying a brake to this disk, the rolls that advance the tire are stopped. As this claim is limited to two brakes, one on the power driven disk and one on the shuttle, the combination called for is not that of the defendant, which has but a single brake and that on the power driven disk. Furthermore, the defendant does not have the unitary control which the plaintiff has by a single lever. It has two levers and perhaps three. The right-hand lever closes the beads and applies the power—it has nothing to do with opening the brake. The brake is always open except when the other or left-hand lever is depressed by the operator. The left-hand lever, on being depressed to apply the brake, releases a pawl that holds the right-hand lever down when the power is on and the bead rolls closed, and when the pawl is released gravity releases the power and the springs

that open the bead rolls are allowed to operate and open the rolls.

We do not think the evidence as to commercial success is especially helpful. Although the plaintiff's wire wrapping machine has attained some success in the wrapping of wire, it attained none as a tire wrapping machine. It was cumbersome, and the parts were so situated and arranged that it would not receive the larger tires and was not readily adjustable to tires of different sizes. It was because of this that, in 1911, the plaintiff purchased the Stevens patent and two of his machines, the parts in which were so situated and arranged that they would readily receive the largest tires and could be adjusted radially and differentially to receive tires of different sizes. It was after the adoption of the essential organization of the Stevens machine in the plaintiff's present tire wrapping machine that it met with commercial success, and we regard its success as largely due to the fundamental conception disclosed in the Stevens patent rather than to the minor changes which the plaintiff added. The bead closers were not added until 1919, and the unitary control not until some time later. The tremendous increase in the output of tires after the war also had much to do with the sales of the plaintiff's machine.

The decree of the District Court is reversed, and the case is remanded to that court, with directions to dismiss the bill; the appellant recovering costs in both courts.